HARRY DUPUY v. THE STATE.

No. 19777.   Delivered June 22, 1938.
On the merits October 19, 1938.
Rehearing denied December 7, 1938.

The opinion states the case.

*Prentice Oltorf, Bartlett & Bartlett, Robert G. Carter,* and *Bartlett, Carter & Rice,* all of Marlin, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is misapplication of public money; the punishment, confinement in the penitentiary for two years.

The certificate of the clerk to the transcript recites that said transcript reflects a true and correct record of the cause "according to the filed papers in said cause." It appears from the record that appellant gave notice of appeal, but there is nothing to show that such notice was recorded in the minutes of the court as required by law. Looking to the certificate of the clerk to which we have referred, it would seem that the instrument embracing the notice of appeal was merely filed. Under the circumstances, the appeal must be dismissed. See Wheeler v. State, 42 S. W. (2d) 69.

The appeal is dismissed. Appellant is granted fifteen days from this date in which to perfect the record.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON THE MERITS.

CHRISTIAN, JUDGE.—The record having been corrected, the appeal is reinstated and the case considered on its merits.

Appellant was the assessor and collector of the Marlin Independent School District. An audit of his accounts disclosed a shortage of approximately $5,800.00. According to the testimony of the State, when such shortage was called to the attention of appellant, he did not question the correctness of the auditor's report. A representative of the American Surety Company tes-

tified, in part, as follows: "He [appellant] told me that the various items listed—if I remember correctly they were the items of the Arlington Hotel taxes, the Falls Hotel taxes and the taxes of Mr. T. B. McQueen and T. A. Cheeves, Sr., and the Texas Utilities Company and the item or items of each of the three banks—the First National, the Marlin National Bank and the First State Bank—there were eight items involved totaling approximately $5,800—$5,861 and some odd cents, and items of errors of $107, making a total shown at that time of $5,969.75, all of which Mr. Dupuy [appellant] told me had been collected but which he had not reported as collected because he didn't have the money to match the report with. The payments, he stated—the money, he didn't give me any definite information as to what became of the money, but he supposed it had been used up in living and other expenses. As to whether he made any explanation as to what he meant by other expenses, it was just left in that shape. There was no definite disposition of it."

Appellant subsequently approached a member of the school board with an offer to give notes in an amount sufficient to cover the shortage. This witness testified, in part, as follows: "He [appellant] did not question the correctness of the shortage. He has never at any time questioned the correctness of the shortage to me."

We quote from the testimony of the auditor: "As to at that time how much shortage had I discovered, at that time I had discovered what was reflected on the books in the way of receipts not written up and a few little minor corrections. That amount is $5,969.75. I called his [appellant's] attention to that shortage. He said he had a supplemental report to make and was trying to raise a little money. He said he had all but about $1,800 and he was trying to borrow some money on some real estate, and he thought that in a few days time he could clear it up. As to whether I pointed out any of the several items mentioned in the tax receipt books but not accounted for in the cash book or accounted for in the deposit book at the bank, I told him about these eight items. We had a list of them before us. * * * He looked at the items. He said he knew they had not been accounted for. I told him that they hadn't and he said he knew it—he knew every one of them—that he knew every one of them by heart. He did not question the correctness of the audit."

It appears from the testimony of the State that at the time appellant retired from office a volume covering ninety-nine tax

receipts for the year 1935 was missing. Items of collection in the approximate sum of $6,400.00 were not accounted for by appellant and not shown on his report book. However, the checks covering these items were deposited by appellant and credited to the school district account in the official depository bank. On this point the testimony of the State warranted the conclusion that the deposit of such amounts without accounting therefor operated to cover up a previous shortage resulting from a conversion by appellant of approximately $5,800.00 belonging to the school district.

Appellant testified that when the report of the auditor was called to his attention he requested time in which to make a supplemental report "up to the sum of $3,800." Further, he testified that he advised a member of the school board he would be in a position after paying $3,800 to complete his entire supplemental report for an amount sufficient to cover the shortage. The board member advised him that the matter of the shortage had been referred to a representative of the American Surety Company, surety on appellant's official bond. At this juncture, we quote from appellant's testimony on direct examination, as follows:

"He [referring to a member of the board of trustees] didn't accept the $3,800. He said he couldn't. We talked on and a few minutes later he asked me, I believe, how I was going to get it, and I explained to him that I had been down and talked to Mr. Penn [referring to the representative of the American Surety Company] and I could raise $3,800 and the bonding company had practically assured me that they would loan me the other $2,000, and where I was getting the other money was money I had borrowed from my mother and was making arrangements for and after he told me I wouldn't be allowed to make my supplemental report, the last thing I told him when I left the porch I said 'If you change your mind and will let me make it I'll be glad to at any time you want me to.' I do not remember how soon after that or how long after that I was indicted. I think it was pretty soon after that, but I am pretty sure I was up there along about the 18th of May. * * * As to whether, at the time I went out of office and at the time I turned over the books to my successor, anyone was owing me for taxes, yes, I had quite a bit out. My policy up there in collecting taxes was to collect them and help them every way I could to pay it— so much cash where they were suing them or starting to sue them. Or in case, we always if there was a possible chance, held their checks for them until they would pay the checks and issue

the receipts, and we would hold their checks until they were paid. Some were given credit on the books for the checks and some were paid two and three and four months later and they paid in different ways. * * * Some of them paid installments on the checks they gave me. As to whether, if I had had time to make my supplemental report in July, at the time my term ended, I would have paid all the money owing to the school at that time, as to whether I could have done that, I feel sure of that."

Further, appellant testified on direct examination, in part, as follows: "As to whether at any time I received or took money from the tax-payers of the school district for the purpose of depriving the school district of the money, that was never my intent. As to whether there is some evidence here about some books being missing and do I know anything about those, the only books I know anything about were left there when I left. You see, when I left, I gave Cuyler Cousins the combination of the vault and the keys to the vault and I think he gave them to Mr. McKnight, and all the records that were there I left just like they were. I didn't know a thing about any of them after that. I did not at any time dispose of any books."

We quote from the testimony of appellant on cross-examination, as follows: "The audit of the books is correct so far as it reflects the amount of money received through tax receipts and deposited in the bank as reflected in the report book and the bank pass book. As to where that six thousand dollars is, the difference in the balance of these books, the receipts and the deposits, well I stand ready like I said before. My proposition to Mr. Robinson stands. As to whether you are not asking me about a proposition to Mr. Robinson and are asking where that money is or what became of it, I don't. Lots of things could happen. As to whether that is my explanation of it to these twelve men, I do not know where it is. Things happened in that last month, January, that I wouldn't know anything about. * * * As to whether I knew about that $5,800 shortage, it wasn't no shortage. As to whether you will call it the difference between the tax receipts and the deposits, and I knew about that before the auditor came in there, yes. * * * At that time I was talking to Mr. Webb [referring to the auditor] I remember discussing the audit with him the first time there at the office. I didn't have money at that time that belonged to the Marlin Independent School District. I positively did not testify in the trial before that at the time I was talking to Mr. Webb, the auditor of my books, that I had money that belonged to the

Marlin Independent School District and wanted to make a report. I didn't tell him that I had any money. I didn't testify that the shortage was covered by 'hot' checks, the difference between the receipts and deposits. I didn't tell him that. * * * As to whether you are not asking that did I testify before that I didn't have any funds of the Marlin Independent School District, I am sure that I did not have at that time. I have not got any 'hot' checks now to cover the shortage or the difference between those deposits. * * * I have some now that I never pay any attention to. * * * They didn't amount to much. I do not have enough checks received for taxes that have never been cashed to amount to the sum of six thousand some odd dollars—whatever this amounted to. As to where it went I couldn't tell you where it went to, first one thing and then another from time to time. It's been quite a long time. I am sure I couldn't tell this jury item for item where it went. It is not accounted for up until now."

Appellant testified further on cross-examination that it had been his desire to pay the shortage. He said: "That sum of money I wanted to pay back out of funds of my own and that I could get anywhere I could, yes, I was meaning to do that and wanted to do that and begged them to do that because I wanted to keep my record straight."

It was the further version of the appellant that at the time he retired from office he had in his possession checks he had received for the payment of taxes which he had been unable to collect. They were later collected but he had not paid the money into the treasury of the district. Referring to such checks, he testified: "All were paid with the exception of a few. As to whether I collected the money and what I did with the money, I couldn't tell you positively what I did with the money. It has been a couple of years since that happened and I couldn't tell you exactly. * * * As to whether I have lived it up since then, I couldn't tell you definitely. * * * All of this bunch of checks have been made good except two or three and I tell this jury I haven't had a job and I have lived off these checks since then. As to whose money it was, that was my money that I borrowed from the bank and paid those checks; then when it was paid back it was my money."

It is appellant's contention that the evidence is insufficient to support the judgment of conviction, his position being that the State's case was based on specific items aggregating $6,000, which amount appellant had deposited in the bank to the account of the district. It is observed that it was agreed in open

court that the amount represented by such items had been properly deposited and that the district had received the benefit therefrom. We can not agree with appellant that the State's case falls because the proof failed to disclose the misapplication of "particular items of money." It has already been observed that it was the theory of the State that the deposits to which we have referred operated to cover up a previous shortage of $5,800 resulting from the conversion of the district's money by the appellant. We think the testimony we have heretofore set out was sufficient to support such theory.

We pass appellant's contention that the testimony shows he was neither a de facto nor de jure officer of the school district. In a former appeal by appellant it appeared that the indictment charging the embezzlement of approximately $6,000 belonging to the Marlin Independent School District was brought under Article 1534, P. C. At that time appellant contended that the evidence disclosed that he was a public officer, namely, assessor-collector of the Marlin Independent School District, and that he should have been charged to have been such officer. In agreeing with this contention, we used language as follows: "Appellant was a public officer. It is our understanding that in order to charge an officer with embezzling or misapplying public funds, he must be charged as such, and his duties as such officer must authorize or require him to receive money in his official capacity. Dickey v. State, 65 Texas Crim. Rep. 374, 144 S. W. 271. In the present case, it is observed that it is averred in the indictment, in accordance with the requirement of Article 1534, that appellant embezzled the money without the consent of the incorporated institution. Manifestly, the trustees of the district had no authority to authorize appellant to convert to his own use the money of said district, and if appellant had proven that such consent had been given, he would not have been exonerated. We think it is clear that embezzlement by a tax collector of the money of his school district received by him in his capacity as a public officer is not comprehended by the provisions of Article 1534, supra."

The judgment of the trial court was reversed and the cause remanded. See Dupuy v. State, 132 Texas Crim. Rep. 539, 106 S. W. (2d) 287. Under the circumstances, appellant is in no position to assert on this appeal that substantially the same testimony the Court had under consideration on the former appeal shows that he was an agent of the district and not a public officer.

In the indictment herein it was charged that appellant was an officer of the Government of the State of Texas, "to wit, the

tax assessor-collector of the Marlin Independent School District." Article 86, P. C., reads as follows: "If any officer of the government who is by law a receiver or depositary of public money, or any clerk or other person employed about the office of such officer, shall fraudulently take, misapply or convert to his own use, any part of such public money, or secrete the same with intent to take, misapply or convert it to his own use, or shall pay or deliver the same to any person knowing that he is not entitled to receive it, he shall be confined in the penitentiary not less than two nor more than ten years."

We quote the provisions of Article 95, P. C.: "If any officer of any county, city or town, or any person employed by such officer, shall fraudulently take, misapply, or convert to his own use any money, property or other thing of value belonging to such county, city or town, that may have come into his custody or possession by virtue of his office or employment, or shall secret the same with intent to take, misapply or convert it to his own use, or shall pay or deliver the same to any person knowing that he is not entitled to receive it, he shall be confined in the penitentiary not less than two nor more than ten years."

It is appellant's contention that the prosecution should have proceeded under the article last above quoted and not under Article 86, supra, relating to misapplication of public funds by officers of the government. The indictment expressly avers the capacity in which appellant was serving the district. If an assessor and collector of an independent school district should be held to be an officer of the county, it is observed that school districts are but subdivisions of the State Government, organized for convenience in exercising the governmental function of establishing and maintaining public free schools for the benefit of the people. See Lee v. Leonard Independent School District, 24 S. W. (2d) 449, and El Dorado Independent School Dist. et al. v. Tisdale et al., 3 S. W. (2d) 420. The designation in the indictment of the office appellant occupied would seem to fix his status as a public officer irrespective of an averment that he was a county officer. Hence, in our opinion, neither the indictment should be held invalid nor the proof at variance with the allegation merely because the pleader charged appellant to have been an officer of the government, "to wit, assessor-collector of the Marlin Independent School District." It is observed from reading Articles 86 and 95, supra, that the acts denounced therein are the same and that the penalty provided for a violation of the terms of such statutes is the same.

Whether appellant was an officer of the government or of the county we deem it unnecessary to decide. That he was an officer of the Marlin Independent School District was sufficiently shown by the evidence. It follows that he was a public officer of one of the subdivisions of the State Government. Lee v. Leonard Independent School Dist., supra.

It is insisted by appellant that the testimony fails to show the creation of the Marlin Independent School District in accordance with the procedure provided by law. Appellant admitted that he had been appointed assessor-collector of the Marlin Independent School District and that he performed the duties of such office. The testimony further shows that the district was situated in Falls County; that it had a board of trustees; that meetings were held; that the proceedings had at such meetings were reflected in the minutes kept by the board; that the district levied and collected taxes; that it had a designated depository. In the trial no contention was made that the district had not been regularly created. Whether appellant would have been in a position in the court below to have made such contention we do not decide. Suffice it to say that the testimony before us is uncontroverted that the Marlin Independent School District was in existence and carrying on the functions of a political subdivision of the State Government. It follows that we are unable to agree with appellant's contention.

Appellant insists that the indictment fails to aver that the Marlin Independent School District is in Falls County, State of Texas. On this point, the allegations are in substance that appellant was, in the County of Falls and State of Texas, tax assessor-collector of the Marlin Independent School District; that as such officer and by virtue of his said office, there had come into his hands and was in his charge, custody and possession $6,475.25 in money of the value of $6,475.25 which then and there was the property of the said Marlin Independent School District; that appellant did then and there unlawfully and fraudulently take, misapply and convert the same to his own use. It is averred that the embezzlement occurred on or about the 31st day of March, 1936. We think it was sufficiently alleged that the district was in Falls County, State of Texas.

Appellant asserts that the indictment is insufficient in several particulars. Without setting out such complaints, suffice it to say we have reached the conclusion that the offense is sufficiently charged.

The record embraces twenty-four bills of exception, all of

which have been carefully examined. To discuss each of said bills would unduly lengthen the opinion. We content ourselves with the statement that we are of opinion said bills fail to reflect reversible error.

Appellant reserved numerous exceptions to the charge of the court, and particularly to paragraph 6 thereof, on the ground that it shifted the burden of proof. We quote said paragraph, as follows:

"You are further instructed that if you believe from the evidence, beyond a reasonable doubt, that the defendant was short in his accounts with the Marlin Independent School District, and you further believe that such shortage was not brought about by reason of any fraudulent acts or fraudulent intent on the part of the defendant, then you will acquit him, or if you have a reasonable doubt thereof, you will acquit him and say by your verdict 'Not Guilty'."

At the request of the appellant the court submitted to the jury a special charge reading as follows:

"GENTLEMEN OF THE JURY: Although you might believe and find from the evidence that on or about the time alleged in the indictment the defendant had collected and received tax money belonging to the Marlin Independent School District to a total amount in excess of the total amount which he paid into the depository of said school district, yet if you believe from the evidence that no part of said difference in amount was taken, misapplied or converted by the defendant to his own use with a fraudulent intent on his part to deprive the school district of any of such difference, or if you have a reasonable doubt as to whether or not the failure of the defendant to pay in as much money as he had collected was with a fraudulent intent on his part, then you will acquit the defendant."

We are unable to agree with appellant that there was anything in the charge, when considered in connection with the requested instruction, which was calculated to lead the jury to the conclusion that it was incumbent upon appellant to show beyond a reasonable doubt that he entertained no fraudulent intent.

A careful examination of the record leads us to the conclusion that reversible error is not presented.

The judgment is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

## ON MOTION FOR REHEARING.

GRAVES, JUDGE.—Appellant was heretofore charged under Article 1534, P. C., as an agent of an incorporated company, and that he embezzled and misapplied moneys without the consent of the officers of such institution. This cause, reported in 132 Texas Crim. Rep. 539, 106 S. W. (2d) 287, was reversed and remanded because of our holding that appellant was indicted under an improper statute, that is, under Article 1534, P. C. That the consent of such trustees for the taking of such money would have availed him nothing, since they had no power to thus consent. This present indictment is based on another statute which denounces the misapplication of public moneys. We think he was thus properly charged. Independent school districts are a portion of the government, and as such they are exercising a governmental function. See Dupuy v. State, 132 Texas Crim. Rep. 539, 106 S. W. (2d) 288, and authorities there cited.

We have again carefully gone over the record, and we think the original opinion herein has correctly decided the matters presented, and the motion for a rehearing is overruled.